1. Pauline Horvath, Pro Se
   3544 Custer Street, #3
2. Oakland, CA 94601
   510-532-3680 .

3.

UNITED STATES DISTRICT COURT

4.

NORTHERN DISTRICT OF CALIFORNIA **FILED**

5.

SAN FRANCISCO DIVISION

6.                                           MAY  2 2008

7. _____        RICHARD W. WIEKING
                                            CLERK, U.S. DISTRICT COURT
                                            NORTHERN DISTRICT OF CALIFORNIA
                                            SAN JOSE
                                    )
8.                                  )
     Pauline Horvath                )
9.   3544 Custer St., #3            )
     Oakland, CA  94601             )
10.                                 )
                                    )
11.              Plaintiff          )
                                    )
12.                                 )
                                    ) No. C 07-4952 JSW
13.                                 ) Amended Complaint
                                    )
14.    vs.                          )
                                    )
15. Dr. Donald C. Winter            )
     Secretary,                     )
16. Department of The Navy          )
                                    )
17.                                 )
                                    )
18.              Defendant          )
                                    )
19.                                 )
   _____)

20.

21. This action is brought pursuant to Title VII of the Civil

22. Rights Act of 1964 as amended for employment retaliation and

23. the remedy sought falls under Title VII.

24. This court has jurisdiction to decide this claim because it

25. involves the United States as a party. This court further has

26. jurisdiction to decide this claim as Ms. Horvath exhausted all

Plaintiff's Amended Complaint
C 07-4952 JSW                    1

1.  of the administrative remedies available to her under 29 C.F.R.

2.  Section 1614.105 (a) (1), prior to filing this complaint.

3.  Equitable and other relief is sought under 42 U.S.C. Section

4.  2000e-5(g)

5.  Ms. Horvath filed charges with the Federal Equal Employment

6.  Opportunity Commission regarding defendant Navy's alleged

7.  discriminatory conduct on or about April 2000. The Equal

8.  Employment Opportunity Commission issued a Notice-of-Right-to-

9.  Sue Letter which was received by Ms. Horvath on or about June

10. 26, 2007. Copy attached to original Federal Court Complaint.

11. Details of the Complaint:

12. This complaint for retaliation alleges from 1986 and

13. thereafter, the Navy placed Plaintiff Pauline Horvath on a

14. blacklist because she had previously filed an informal EEO

15. discrimination complaint and that she consequently suffered the

16. adverse action of not being promoted due to blacklisting.

17. Ms. Horvath alleges that she was blacklisted along with other

18. Navy employees who had filed EEO complaints and that non-

19. promotions and other negative actions were suffered by this

20. group.

21. Although the Office of Federal Operations (OFO) did not certify

22. the group as a class, the blacklists themselves and the

23. numerous declarations Ms. Horvath has obtained over a period of

24. years, beginning in 1998, substantiate a large class

25. exists that is traditionally treated in a less favorable manner

26. than employees who never file EEO complaints.

Plaintiff's Amended Complaint
C07-4952 JSW                    2

1. Although Navy blacklisting does not differentiate between those
2. who prevail in their EEO complaints, from those who do not,
3. regardless, all employees have a right not to be treated less
4. favorably because they have made an informal or formal EEO
5. complaint.

6. Along with this complaint, Ms. Horvath submitted a letter to
7. Admiral Mike Mullen, Chief of Naval Operations, in a plea for
8. assistance to end this retaliatory practice. Copy attached to
9. original Federal Court complaint.

10. During the relevant period, the Navy employed Ms. Horvath as a
11. Personnel Staffing Specialist, GS-212-11 at the Naval Aviation
12. Depot, in Alameda, California. Ms. Horvath's employment with
13. the Navy terminated in 1993, exh. 1, Official Navy Notice of
14. Personnel Action dated April 1993 (she physically stopped
15. working June 1992).

16. After Ms. Horvath filed her informal EEO complaint in 1986, she
17. applied for various GS/GM-11/12/13 positions and professional
18. opportunities in personnel. Ms. Horvath had received
19. approximately a promotion a year prior to filing her 1986 EEO
20. complaint. It was her practice to apply for all positions for
21. which she felt she would be highly qualified.

22. Ms. Horvath cannot state with absolute certainty that the
23. following is an inclusive list of positions and professional
24. opportunities for which she applied and was denied. The list
25. and following information does substantiate she applied for
26. many positions for which she was highly qualified and not

Plaintiff's Amended Complaint
C07-4952 JSW                    3

1.  (A) Announcement #89-001, Personnel Management Specialist, GS-
    201-12   position announcement submitted, exh. 2.
2.  (B) Announcement #89-015, Personnel Staffing Specialist, GS-
    201-12, position announcement submitted, exh.3
3.  (C) Announcement #89-119, Personnel Staffing Specialist, GS-
    212-12, Handled by Marilyn Dodge, position announcement
4.  submitted in original Federal Court filing.

5.  (D) Announcement #91-58, Personnel Staffing Specialist, GS-212-
    11 (Pot.12), Notice of Rating signed by Nancy Cowdin submitted
6.  in original Federal Court Filing.

7.  (E) Announcement #91-61, Personnel Management Specialist, GS-
    201-12 (Pot. GM-13)
8.  (F) Federal Women's Executive Leadership Program, Training
    Branch employee, Gigi Geru, can verify Ms. Horvath applied and
9.  was denied.

10. Five managers whom Ms. Horvath was under consideration

11. for promotion with are: Jewel Tedrick, Mary Marks, William

12. Jackson, Donna Wolin and Terrence Hall (this may not be an

13. inclusive list)

14. The staffing specialists within the Civilian Personnel

15. Department whose duties it was to determine Ms. Horvath's

16. eligibility, to send her notices of rating, selection, etc. are

17. Marilyn Dodge and Nancy Cowdin.

18. These specialists have knowledge of Ms. Horvath applying for

19. many positions during the relevant period and of her not being

20. promoted

21. There are several additional employees who have knowledge of

22.  Ms. Horvath applying for supervisory and non-supervisory

23. personnel promotions.

24. Ms. Sally Sablan, a long time Personnel Staffing Specialist of

25. many years, who was a co-worker of Ms. Horvath, was aware Ms.

26. Horvath had applied for promotions. Ms. Horvath remembers Ms.

Plaintiff's Amended Complaint
C07-4952 JSW                         4

1.  Sablan because she had expressed disbelief at Ms. Horvath's
2.  non-selection  for one of the promotions she had applied for,
3.  in particular.

4.  Ms. Charlotte Dent was selected for that position. To Ms.
5.  Horvath's knowledge, Ms. Dent had not filed an EEO complaint.
6.  It was common for most of the positions Ms. Horvath applied for
7.  in the GS/GM-12/13 levels to be supervisory. The GS-12 position
8.  for which Ms. Dent was selected, was uncommon in that it was
9.  non-supervisory. Usually the higher the grade level of a
10. position, the more likely it was that it would be supervisory.
11. Ms. Sablan was surprised because of the eligible employees for
12.  the promotion, she believed Ms. Horvath to be the most
13. qualified and best suited for the duties of the position.
14. The position involved a great deal of research and in depth
15. knowledge of all the branches of the personnel department:
16. Staffing, Classification, Training, Labor/Employee relations
17. and EEO. Ms. Horvath had a background in each of these areas.
18. Although Ms. Horvath's grade level was a GS-11, it had been
19. other personnel department employees practice (including
20. supervisors) to frequently request her assistance with
21. research, especially where it concerned issues involving one or
22. more personnel branches. Ms. Horvath was also sought out by
23. customers who came to her from other departments she was not
24. responsible for servicing (she had not been officially assigned
25. their departments), when those customers had not been able to
26. obtain adequate assistance from their own assigned staffing

Plaintiff's Amended Complaint
CO7-4952 JSW                    5

1. specialists. Even after Ms. Dent was promoted to the position,
2. on several occasions, Ms. Horvath continued to assist some of
3. Ms. Dent's assigned employees when Ms. Dent had been unable to
4. provide them adequate assistance.

5. In addition to Ms. Sablan and Ms. Dodge, several employees in
6. and outside the personnel department were aware Ms. Horvath was
7. adept at personnel research in solving cross-branch problems.
8. Issues often arose, for example, between the classification of
9. a position in the classification branch and the filling of a
10. position in the staffing branch, which required a specialist
11. with knowledge of both branches.

12. Ms. Horvath's long term car pool driver, Richard Scott and
13. "Chuck" both have knowledge that Ms. Horvath applied for
14. promotions during the period in question, as they had been
15. shown some of her applications and Mr. Scott, in particular,
16. had been very excited and interested when Ms. Horvath had
17. applied for one of the managerial GS-12/GM-13 positions, which
18. he had placed in the personnel "drop box" for her. Mr. Scott
19. had also been very interested in Ms. Horvath's application for
20. the Women's Executive Leadership Program, which Ms. Horvath was
21. also denied. Mr. Scott had also requested that Ms. Horvath
22. assist him with the review and preparation of his own
23. application in the wage grade (WG) area, as he informed her he
24. felt her applications were very thorough.

25. After Ms. Horvath had applied for promotions and professional
26. opportunities, she did not consult an EEO counselor within 45

Plaintiff's Amended Complaint
C07-4952 JSW                          6

1. days of not receiving those promotions or opportunities because
2. she had total unawareness of the existence of any form of Navy
3. Blacklist and she was unaware of how her several non-promotions
4. and denial of professional opportunities were the result of her
5. own name appearing on the Navy blacklist. Her last actual work
6. day was June 1992 and she was not informed of Navy blacklisting
7. until 1998.

8. Ms. Horvath filed her first formal EEO complaint in 1992. There
9. were over 100 witnesses in that complaint. Ms. Horvath, in
10. addition to the formal EEO investigator, spoke to many Navy
11. employees. Some of these employees later provided Ms. Horvath
12. testimony for her retaliation complaints that followed, which
13. were related to her 1992 complaint.

14. Approximately June 14th, 1998, a phone conversation took place
15. between Ms. Horvath and Ms. Lydia Cesar. Ms. Horvath had been
16. discussing issues relating to her retaliation complaints of the
17. Navy having delayed and denied all her benefits after she filed
18. her 1992 complaint. They continued to discuss the general
19. retaliatory nature of the Navy against Ms. Horvath, after she
20. filed her formal complaint. At about that point, Ms. Cesar
21. informed Ms. Horvath that she had now been blacklisted.   She
22. informed her she had been blacklisted because she had filed one
23. or more EEO complaints. This was the very first time Ms.
24. Horvath had ever heard any mention of a Navy blacklist.
25. Ms. Cesar was a former Navy secretary. The first and earliest
26. declaration Ms. Horvath obtained from Ms. Cesar is dated June

Plaintiff's Amended Complaint
C07-4952 JSW                         7

1.  14th 1998, the first time Ms. Horvath learned of Navy
2.  blacklisting, exh. 4.
3.  Ms. Cesar may be called upon for testimony, that, from Ms.
4.  Horvath's reactions to her disclosure of Navy blacklisting,
5.  June 1998 was the first time Ms. Horvath ever heard of
6.  blacklisting.
7.  Ms. Horvath had several conversations with Ms. Cesar on
8.  blacklisting and Ms. Cesar completed additional declarations
9.  dated May 8, 1999  and June 15, 1999, exhs. 5 and 6. In her
10. declarations she describes how the Navy blacklist was located
11. in the Command History and how it was used to negatively impact
12. promotional and professional opportunities of those who filed
13. EEO complaints.
14. Ms. Horvath  had blacklisting conversations with many other
15. employees, most of whom (approximately 99%) were unaware of
16. Navy blacklisting. She did obtain, over the years, many
17. declarations from employees from all levels, aware of
18. blacklisting and it retaliatory impact on that group who filed
19. EEO complaints.
20. One of the most significant August 20, 2004 declarations
21. obtained by Ms. Horvath was that of Tranquilino Martinez, who
22. was a former Deputy Equal Employment Officer who had worked at
23. the Naval Base in Alameda. He provides a detailed description
24. of how the basic blacklisting process began and how it is being
25. carried forward.
26. He explains how blacklisting began when the Federal District

1.  Court ordered the Alameda Naval base to institute the Consent

2.  Decree in hiring and promoting minorities, due to the great

3.  discrepancies between minority and non-minority employees at

4.  the time. He explains how top management rebelled against the

5.  Court order by instituting a secret blacklisting system and

6. that thereafter, employees who filed EEO complaints were to be

7.  considered disloyal and unworthy of promotions. Ms. Horvath and

8.  many others were a victim of this system.   Declaration

9.  submitted in original Federal Court Filing.

10. See also declaration of Albert Roth, Jr., another supervisory

11. employee who was aware of blacklisting, but did not agree with

12. it. March 27, 2003 declaration submitted with original Federal

13. Court Filing.

14. Also see May 21, 1999 declaration of Remigio Agustin, another

15. supervisory employee who did not agree with Navy blacklisting.

16. Page one of his declaration states

17. "he used to see a listing of cases of agency employees who had
    filed EEO discrimination complaint/s, which were being
18. distributed only to supervisors or managers. That the list had
    printed (and added hand written names, and he was told that the
19. printed names were names of employees who had filed formal EEO
    complaints and the add-on handwritten names were the ones who
20. had filed informal-EEO complaints." Submitted with original
    Federal Court filing.
21. Ms. Horvath learned from Ms. Cesar and other employees that the

22. blacklist was located in an official Navy publication called

23. the Command History, Report Symbol OPNAV 5750-1, sample 1991

24. Command History Cover sheet and blacklist with the names of

25. employees who had filed formal EEO complaints listed. Submitted

26. with original Federal Court filing.

Plaintiff's Amended Complaint
C07-4952 JSW                    9

1. Because the Command History blacklist appeared to contain only
2. the names of employees who had taken their EEO complaints to
3. the Federal Court or higher, Ms. Horvath did not originally
4. understand how she could have been blacklisted because her
5. first 1986 informal complaint was never filed formal. Mr.
6. Agustin's declaration describing the Navy practice of adding
7. the names of those who filed informal complaints to the
8. blacklist provided Ms. Horvath the explanation of how she had
9. been blacklisted with only an informal complaint.
10. Ms. Horvath did not actually locate employees with more
11. specific knowledge of how her personally being blacklisted had
12. caused her non-promotions until long after her first
13. conversation with Ms. Cesar.
14. Although Ms. Ceasar was the first one to inform Ms. Horvath of
15. the existence of the blacklist, she did not recall whether or
16. not she had seen Ms. Horvath's name printed or added on one of
17.the lists.
18. Ms. Ruth Stevens's March 20, 1999 declaration, exh. 7,
19. describes in detail how Ms. Horvath was associated with the
20. Navy blacklist and non-promotional opportunities and states
21. she saw Ms. Horvath's name on that blacklist.
22. Ms. Iman Visarraga's June 17, 1999 declaration, exh. 8,
23. describes that she also personally saw Ms. Horvath's name on
24. the Navy blacklist and provides additional descriptions of how
25. the blacklist was used in a retaliatory manner to not promote
26. EEO complaint filers.

Plaintiff's Amended Complaint
C07-4952 JSW                    10

1.  Ms. Horvath filed her July 23, 1998 EEO complaint regarding

2.  blacklisting, to insure her timeliness, even though she lacked

3.  detailed evidence of the blacklist itself and how being

4.  blacklisted had resulted in the denial of her own promotions

5.  and professional opportunities.

6.  In discussions with various employees regarding the blacklist,

7.  it often appeared that employees who were secretaries to high

8. level managers, often accidently or otherwise had become aware

9.  of the existence of blacklisting. Ms. Cesar was in that

10. category.  Ms. Horvath also obtained declarations on different

11. dates from other secretaries who had knowledge of blacklisting.

12. They are Rita Sonquist, June Anderson, and Bea Bushnel.  All of

13. the supervisory through secretarial declarations provide

14. validity to the existence and retaliatory use of Navy

15. blacklists.

16. Without Ms. Cesar's disclosure to Ms. Horvath in June of 1998,

17. Ms. Horvath would have never learned she had not been promoted

18. because of being blacklisted. Ms. Horvath did obtain some

19. declarations from employees who were totally unaware of the

20. Navy Blacklist, even though their names appeared on the Command

21. History Navy blacklist. One example is Ms. Carol Fairweather,

22. exh. 9, June 19, 2004 declaration, whose name appears printed

23. prominently in the 1991 Command History blacklist.

24. Ms. Fairweather prevailed in her EEO complaint. Her declaration

25. states she was totally unaware of blacklisting or of her name

26. being printed on the 1991 listing or any other listing. This is

Plaintiff's Amended Complaint
C07-4952 JSW                    11

1.  despite the fact she states in her declaration that as a
2.  training branch employee she had contributed material for the
3.  Command History Training Section. She never saw the completed
4.  product.
5.  Robert Elliot, a labor relations employee, also provided a
6.  statement to Cec Cilly, Navy investigator, that he was unaware
7.  of being blacklisted.
8.  Ms. Horvath therefore, whose name was not even typed, but had
9.  been added to the Command History Blacklist, cannot be faulted
10. for being unaware she was being blacklisted and therefore not
11. promoted, until 1998.  Ms. Fairweather herself did not become
12. aware of being blacklisted until 2004.
13. For the above reasons, the doctrine of equitable tolling should
14. prevent a statute of limitations from running against Ms.
15. Horvath as she was unaware of her cause of action until she
16. learned of it from Ms. Cesar.
17. Throughout the periods Ms. Horvath had applied for her
18. promotions and professional opportunities, Ms. Horvath did not
19. have available vital information bearing on the existence of a
20. non-promotion claim until 1998, despite the non-promotions and
21. professional opportunities having occurred at much earlier
22. dates. Ms. Horvath demonstrated due diligence in filing a
23. complaint regarding blacklisting causing her non-promotions, at
24. her earliest opportunity, which was July 23, 1998.  Therefore,
25. Ms. Horvath requests equitable tolling of the deadlines
26. associated with the exhaustion of her administrative remedies.

Plaintiff's Amended Complaint
C07-4952 JSW                    12

1.   Plaintiff hereby demands a jury for all claims for which a jury

2.   is permitted.

3.   Wherefore, plaintiff prays that the Court grants such relief as

4.   may be appropriate.

5.
     Respectfully Submitted,
6.

7.

8.   *Pauline Horvath*                    *May 2, 2008*

9.   Plaintiff,                           Date
     Pauline Horvath
10.

11.

12.

13.

14.

15.

16.

17.

18.

19.

20.

21.

22.

23.

24.

25.

26.

Plaintiff's Amended Complaint
CO7-4952 JSW                    13

Standard Form 50-B
Rev. 8/88
U.S. Office of Personnel Management
FPM Chapter 296

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| HORVATH PAULINE M | 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 | 07-02-55 | 04-01-93 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code  5-B. Nature of Action  EXT OF LWOP NTE | | 6-A. Code  6-B. Nature of Action | |
| 773 | 07-29-93 | | |
| 5-C. Code  5-D. Legal Authority  FPM CH 630 | | 6-C. Code  6-D. Legal Authority | |
| DAM | | | |
| 5-E. Code  5-F. Legal Authority | | 6-E. Code  6-F. Legal Authority | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| PERSONNEL STAFFING SPECIALIST  QD0AZ24001 | |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0212 | 11 | 05 | $41,156.00 | PA | | | | | | |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| CIVILIAN PERSONNEL DEPARTMENT  PERSONNEL OPERATIONS & POLICY DIVISION  PERSONNEL STAFFING & OPERATIONS MGMT B  NAVAL AVIATION DEPOT, ALAMEDA, CA | |

| EMPLOYEE DATA | | | | |
|---|---|---|---|---|
| 23. Veteran Preference  1 - None  3 -10-Point/Disability  5 - 10-Point/Other  2 - 5-Point  4 -10-Point/Compensable  6 -10-Point/Compensable/30%  **1** | 24. Tenure  0 - None  2 - Conditional  1 - Permanent  3 - Indefinite  **1** | 25. Agency Use | 26. Veterans Preference for RIF  YES  [X] NO | |
| 27. FEGLI  BASIC LIFE ONLY  C | 28. Annuitant Indicator  NOT APPLICABLE  9 | | 29. Pay Rate Determinant  0 | |
| 30. Retirement Plan  CSRS  1 | 31. Service Comp. Date (Leave)  10-12-82 | 32. Work Schedule  F - Full-time  G - FT Seasonal  H - FT On-Call  P - Part-Time  Q - PT Seasonal  R - PT On Call  I - Intermittent  J - INT Seasonal  **F** | 33. Part-Time Hours Per  Biweekly Pay Period | |

| POSITION DATA | | | | |
|---|---|---|---|---|
| 34. Position Occupied  1 - Competitive Service  3 - SES General  2 - Excepted Service  4 - SES Career Reserved  **1** | 35. FLSA Category  E - Exempt  N - Nonexempt  **E** | 36. Appropriation Code | 37. Bargaining Unit Status  8888 | |
| 38. Duty Station Code  06-0010-001 | 39. Duty Station (City - County - State or Overseas Location)  ALAMEDA  ALAMEDA    CA | | | |
| 40. Agency Data  HIC:  65885 | 41. ORG CODE:  09235 | 42. COST CNTR:  08810 | 44.  LOC ID: N801-023264 | |

45. Remarks **** BLOCK 12 INCLUDES ****                       **** BLOCK 20 INCLUDES ****
BASIC PAY    LOCALITY    ADJ BASIC PAY :  BASIC PAY    LOCALITY    ADJ BASIC PAY
$38,107.00   $ 3049      $41,156.00    : $    0       $    0      $    0
RETENTION   STAFFING   SUPERVISORY   AUO : RETENTION   STAFFING   SUPERVISORY   AUO
$   0       $   0       $   0      $   0 : $   0       $   0      $   0      $   0
FORWARDING ADDRESS: 25899 SEAVER STREET, HAYWARD, CA 94545
SF-8 ISSUED.
HEALTH BENEFITS COVERAGE WILL CONTINUE FOR UP TO 365 DAYS IN NON-PAY STATUS
UNLESS YOU CANCEL YOUR ENROLLMENT. YOU ARE LIABLE FOR YOUR FULL SHARE OF THE
PREMIUMS FOR THIS PERIOD. PAYMENTS SHOULD BE MADE TO YOUR AGENCY DURING YOUR
NON-PAY STATUS OR WHEN YOU RETURN TO DUTY.

| 46. Employing Department or Agency  DEPARTMENT OF THE NAVY | | 50. Signature/Authentication and Title of Approving Official | |
|---|---|---|---|
| 47. Agency Code  NV19 | 48. Personnel Office ID  2370 | 49. Approval Date  04-02-93    3LM | HEAD, STAFFING BRANCH |

TURN OVER FOR IMPORTANT INFORMATION
5 - PART    50-314

1 - Employee Copy - Keep for Future Reference

Editions Prior to 4/87 Are Unusable After 9/30/
NSN 7540-01-249-19

*Ex H I*



ANNOUNCEMENT NO: 89-001
PERSONNEL MANAGEMENT SPECIALIST, GS-201-12

AREA OF CONSIDERATION: FEDERAL EMPLOYEES COMMUTING AREA

TO APPLY, SUBMIT:  SF-171     SUPPLEMENTAL EXPERIENCE STATEMENT
COPY OF MOST RECENT PERFORMANCE APPRAISAL
MERIT PROMOTION PROGRAM APPLICATION FORM NSTI 12335/1 (3-88)
NOTE: Applicants for promotion must fill out Merit Promotion Program
Application Form, NSTI 12335/1 (3-88). All other applicants must
submit SF-171's.

DUTIES:
The incumbent of this position serves as a personnel management
evaluation staff member for the NWR. Responsibilities include the
following:  serves as functional program lead for many on-site
evaluations, on a rotating basis, in specific areas; serves as a team
leader on reviews of small activities; when not a functional program or
team leader, will serve as an evaluation team member; conducts or
assists in the conduct of Program Emphasis Reviews or Program
Implementation Reviews; assists activities in performing a self-
evaluation; and conducts training in subject matter specialties.

QUALIFICATIONS:  Three years of general experience and three years of
specialized experience.  General experience is that which has provided
a good general understanding of the systems, methods, and
administrative machinery for accomplishing the work of an organization;
ability to analyze; ability to communicate; and the capacity to employ
those abilities in resolving problems presented by the assignment.

Specialized experience is in substantive personnel management work
appropriate to the position; or experience in the predominant
functional specialization of the position to be filled providing that
the candidate has an understanding of the other functional areas in the
position and ability to master the other specializations in no more
than six months.

EVALUATION CRITERIA:

1.  Knowledge of personnel management evaluation functions, including
techniques and procedures.

2.  Knowledge of civilian personnel/EEO programs, e.i.,
classification, staffing, employee/labor relations, EEO and employee
development.

3.  Ability to communicate orally.

4.  Ability to communicate in writing, including the ability to
review, compile, and analyze data and prepare reports.

EXH 2



*Plaintiff's copy*

NOTE:   Personal interview may or may not be required.


ANNOUNCEMENT NO: 89-015
PERSONNEL MANAGEMENT SPECIALIST, GS-201-12

AREA OF CONSIDERATION: FEDERAL EMPLOYEES COMMUTING AREA
TO APPLY, SUBMIT:   SF-171   SUPPLEMENTAL EXPERIENCE STATEMENT
COPY OF MOST RECENT PERFORMANCE APPRAISAL
MERIT PROMOTION PROGRAM APPLICATION FORM NSTI 12335/1 (3-88)
NOTE: Applicants for promotion must fill out Merit Promotion Program
Application Form, NSTI 12335/1 (3-88).  All other applicants must submit
SF-171's.

DUTIES:
Assists the Branch Head in planning, developing, and evaluating
Northwest Region (NWR) activity employee development and training needs.
Develops, delivers, updates, and evaluate major elements of NWR training
program.   This includes program management of the Civilian Personnel
Management Field Institute, all CIVPERS/EEO courses and contractor
delivered courses on a variety of supervisory/managerial/administra
topics.   Instructs in his/her areas of expertise, insures the curre
of course content, arranges for others to serve as associate instru,
and contracts as necessary.  Designs and develops workshops or seminars
to meet specific activity training needs.  Collects and evaluates NWR
activity EEO statistics and recommends appropriate assistance to help
overcome under representation.  Provides assistance in resolving activity
discrimination complaints.  Serves as an expert consultant and advisor
to NWR activities on EEO and employee development matters.  Acts as the
liaison point between field activities and OCPM headquarters and NCPC in
policy interpretations.  Assists in special projects, investigations, or
Personnel Management Evaluations of NWR personnel offices.

QUALIFICATIONS:   Three years of general experience and three years of
specialized experience.  General experience is that which has provided a
good general understanding of the systems, methods, and administrative
machinery for accomplishing the work of an organization; ability to
analyze; ability to communicate; and the capacity to employ those
abilities in resolving problems presented by the assignment.

Specialized experience is in substantive personnel management work
appropriate to the position; or experience in the predominant functional
specialization of the position to be filled providing that the candidate
has an understanding of the other functional areas in the position and
ability to master the other specializations in no more than six months.

EVALUATION CRITERIA:
1.   Knowledge of Equal Employment Opportunity policies and programs.

EXH 3

## DECLARATION

I am Lynea Cesar, formerly Lynea Lulmevski and worked at the Navy Base, Alameda for almost 20 yrs. I know, for a fact, that the Command History Book, (Blue Cover) printed yearly existed and to my knowledge produced by EEO Office and sent to all Dept. Heads. This pamphlet listed confidential information regarding cases — names of employees + status of those complaints. It was used, eventually, to discourage promoting those with past or present complaints denying us the promotional opportunity that we were suppose to have available. In other words, "we were dead-ended" and NOT KNOWING WHY"! The Command History books violates the privacy act; other retaliation come about such as non paying employees + losing last checks; making it difficult for compensation cases come about, for instance delaying the processing, losing & providing "no proof" for the action.

PAGE 1 OF 2 PAGES                          INITIALS LC

EXH 4



I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
AND CORRECT TO THE BEST OF MY UNDERSTANDING AND BELIEF.    I
UNDERSTAND THAT ,THE INFORMATION I HAVE GIVEN IS NOT TO BE
CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE INTERESTED
PARTIES.

SIGNED AT: _____ , _____
                 (COUNTY)                    (STATE)

_____      _____
     (SIGNATURE)                    (DATE)

PAGE 2 OF 2 PAGES

E x H 4

<u>D E C L A R A T I O N</u>

I am Lydia Cesar, formerly Lydia Sidewski, who worked almost 20 yrs. for Naval Aviation Depot, Alameda. I had not seen the "Blacklist" Command History Book for several years however - upon seeing the list again I did jog my memory. This Command History Book was often passed around with a routing slip, especially when employees were being considered for promotion. Management and Cesar and advised each other "Don't pick her Fleming!" this was for complaints whether formal or informal. This information would also be passed on at their meetings. This was evil, harmful + discriminatory practice because employees who made complaints did not have embarrassed, fair consideration for promotion and other beneficial opportunities that others had. the person leading, acting or witness during interviews (her Women's Comm.) only said, "Lydia was the best! why don't they give her a chance!" Attorney Lynn Wamsley told my attorney - we don't want Lydia winning "too" much or other employees would be encouraged by it; I would have been an easy inexpensive settlement - but they (Navy) preferred spending thousands of dollars to fight me. there was no fair consideration for promotion and other beneficial opportunities, that others had, who had not made complaints of that type. also those like myself who filed workers comp, were treated badly & paperwork shoved aside + not processed - also leading to other reprisals. One supervisor, some my job a here was closing - because she refused to listen to Personnel's

INITIALS _____

EXH 5

Comments regarding my case; she told me verbally to "my face" they tried to descourage her from picking me up — that when they attempted to descuss my cases — She refused to listen & that sopes me from going out the gate during early true closure demotions / terminations although I did get demoted 2x's before being picked up by that supervisor — 2 grades lower



I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
AND CORRECT TO THE BEST OF MY UNDERSTANDING AND BELIEF.    I
UNDERSTAND THAT THE INFORMATION I HAVE GIVEN IS NOT TO BE
CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE INTERESTED
PARTIES.

SIGNED AT: _____ , _____
              (COUNTY)              (STATE)

_____              5/8/99
  (SIGNATURE)                    (DATE)

PAGE 2 OF 2 PAGES

EXH 5

6/15/99

Declaration

I am Lydia S. Cesar (formerly Lydia S. Lubniewski), working almost 20 yrs. In many areas throughout the NADEP Alameda agency. I was a member of the *Federal Women's Program; secretary for *COACEO (Commanding Officer's Advisory Committee on Equal Opportunity); Service Achiever for March 1985; wrote Beneficial Suggestions (4) that were accepted and was recognized as a trouble shooter – being moved from area to area – project to project for the convenience of management, cleaning up areas others couldn't or wouldn't do. Some of these positions had been left behind in complete disarray by those who were promoted into positions that I highly qualified for but was never allowed to be promoted into.*I **was removed from both committees due to my cases.**

Following my first complaint things were tougher and tougher for me; one complaint led to another and I was being watched very carefully – not allowed to walk down certain hallways (per request of some managers). I was hit on the back, and pushed, without warning by Jerry Duck, then a Div. 500 manager. Security was called, reported that their findings proved he had done this and the dispensary doctor found upon examination that I had indeed been struck. Although this report was requested many times by myself and later on by attorneys, it never surfaced; they had buried it deep.

Managers blocked doorways so that I could not visit with their secretaries and some were afraid to eat at the same table with me in the cafeteria. The person head of Federal Women's Committee made a remark, when interviewed that "Lydia should be given a break" and that it had not been fair to give a certain person the position we had both competed for when my interview had been the *best*.

I must have applied for 30 positions even "Tools control" and highly qualified for most of those but only went up twice - 1 grade - only --- which came only after winning cases. The base attorney told my attorney that they would prefer to have lengthy, costly, litigation than have Lydia win and be encouraged by others.

It was puzzling to go back to doing superior work and not be allowed to go the ladder until someone from the mailroom handed me a copy of the Command History Book, a light blue pamphlet/book that only went to top managers. I was shocked to see my name several times, the cases and status of these. It was my understanding that everything would be confidential from the time we entered the EEO office. EEO office was the office actually giving out the statistics/info that went into print and disseminated out to the managers/personnel. One manager had told me that as the base closed and I was close to being put out – Personnel had warned about my cases and **not** to pick me up.

I also suffered from sexual harassment; one manager said I was a real looker – and kissed me twice after the office had cleared and told me I should take time to look in the mirror some time. I left the building feeling like I had been raped. Some also heard a manager

Page 3 of 3 (Declaration 6/15/99)

CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE
INTERESTED PARTIES.

Signed at:  Alameda County,          State of California

_Lydia S. Cesar_          6 · 15-99

$EXH \zeta$

Page 3 of 3 (Declaration 6/15/99)

CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE
INTERESTED PARTIES.

Signed at:  Alameda County,        State of California

*Lydia S. Cesar*        6 - 15-99

# FAX
# TRANSMITTAL
# SHEET

SUISUN CITY, CA 94585

☐ **Urgent**

☑ **Confidential**

If there are any problems with this
transmission, please call

( 707 ) 429 5780

FAX # (707)

Date: 30 Mar 1999    Time: _____

To: Ms Cec Cilley, EEO Counselor

Fax No.: (805) 989 3335

From: Ruth M. Stevens

Phone No.: (707) 429-5780

# of Pages (including this sheet): 6

Message: _____

Code: 734000E  Attn: Cilley

Note:

Pauline Dean send

you a copy of something

I'd like you to email to

the judge tonight if you

could

because of

the dead line

This facsimile may contain PRIVILEGED AND/OR CONFIDENTIAL
INFORMATION intended only for the use of the addressee. If you
are not the addressee, or the person responsible for delivering it
to the person addressed, you may not copy or deliver this to
anyone else. You are hereby notified that any dissemination or
copying of this facsimile is strictly prohibited. If you received this
facsimile by mistake, please immediately notify us by telephone.
Thank you

Declaration

I am Ruth Stevens, former quality assurance specialist from the
400 department, Naval Aviation Depot, Alameda, Ca.  I Worked
there approximately 12 years.  Pauline Horvath was the
personnel staffing specialist, who serviced my department in
1991/1992. I remember one occasion, in particular, I was coming
from the NADEP Alameda EEO office, down the back stairs of building
5.   I was involved with the Federal Women's Program at the time.
Mail was being picked up and I was speaking with a few women.  One
was Alice Beal and another was Delores Hollingsworth.  She worked
with data collection, especially statistical data. She was part of
the 600 department.

While looking at the mail, one item had everyones attention. It was
a booklet publication that contained various records and
statistical data on the employees and Alameda Naval Base.   It
appeared to be a type of history and the cover was light blue. What
interested us was the pages towards the back of the publication.
On these pages were listed the names and status of all employees
who had filed any type of complaint. It listed their status,
informal, formal, whether they had been settled or gone to EEOC or
District Court. *Many other people I haved talked*
*to have seen & remember those lists.*
This publication was supposed to be just for managers and
supervisors, but because of the personal nature, it often got into
other employees hands. *Perhaps the* managers were provided this publication
so that they would not select these employees for promotion. *I was told* *These*
employees were branded as "troublemakers" not to be trusted,
Page 1 of 5                                          Initials _____

EX H 7

"malcontents" and other derogatory names.  The list was known as
the base "black-list," "hit-list" and by other names. Many managers
went along with this violation of our privacy rights and would not
select employees ~~who~~ *that* they were aware had filed a complaint.  They
were considered disloyal and therefore not worthy of promotion.
*Managers & other employees treated those listed there as paria*
Not all managers agreed with this retaliatory blacklisting
practice. Some appeared not to know about it. I remember asking
about Pauline Horvath's name on it. I was surprised to see her name
listed when I was looking at the booklet, as the other women and I
were looking at the mail.  She worked in personnel and I never
heard any complaints about her, or her work.  This was a personal
thing and I did not know her well enough to personally ask her
about being blacklisted.  I felt sorry for her because she appeared
very competent in her work.  I did not actually have a more
personal conversation with Pauline until after she had left
Navy employment in 1992.  She had contacted me attempting to
discover evidence for her other cases.  She did not ask me about
the black-list until recently, within the last  few months.

I do know that many people suffered not being promoted, due to the
passing around of this list.  It was a source of underground
gossip, because we knew the people on it were marked and dead-ended
in their careers.  I saw my name, the names of Pauline Horvath,
Iman Visarraga, Lydia Lubnieski, Olivia Rocha and several other men
and women I recognized. They were on the list approximately
1991/1992.

@004

Each department had certain managers who were users of this list.
I heard Jewel Tedrick and Mary Marks names mentioned, when
Pauline's name was brought up. It was something to the effect that
they had gotten her and she had no where to go. I only remember
this because they were big employment managers of Personnel and
many employees, including myself knew who they were.

I also know that some managers retaliated against employees who
were blacklisted, in other ways.   I should have been placed in an
alternate positions to enhance my promotional chances.   I was not.
I was told *By my Branch Head & other employees*
I believe this was retaliation for filing a complaint and being
blacklisted. My branch head was not happy when I received a
handicap parking space. My privacy rights were violated in every
way.   One situation was my being a coordinator for the Federal
Combined Campaign. My branch head, Carmen Fortier, freely discussed
my donation with our work group, without my permission.

Another case involved an employee named Delphine Metcalf. She had
gone to Desert Storm and had been injured.   Carmen Fortier was
saying that she was not going to be fit for anything anymore and
that she was not going to be working there anywhere.   Her medical
condition was freely spoken of, where all could hear. My carpal
tunnel condition was also talked about in our office in front of
everyone. When you filed a complaint, these managers violated and
threatened you openly.   I was told by Jim Taylor *John Oba* that I would get
nowhere in my career, if I did not cancel my complaints. I was
ostracized and pigeon-holed in my career.

Page 3 of 5                                          Initials

Printing and using the blacklist to not promote employees with complaints was just part of the retaliatory atmosphere that prevailed at Alameda. Many people did not speak out about it because they were plain scared of being placed on the list themselves. The existence of the list was a way they kept people in line, No one wanted to be fired or not get a promotion. I was told point blank that I would not get a position anywhere, unless I canceled my complaint. I would not agree and they made me suffer for it.

I felt sorry for Pauline because I knew that employment supervisors, Mary Marks and Jewel Tedrick had been involved in other employment actions that everyone knew were biased. For example, under the Pace Program, people were told they would get GS-9's and when they finally got their first pay check, it was for GS-5. Certain people complained and the employment supervisors and payroll office somehow took them off payroll and put them back in another position in one day. These employment supervisors and our

*at the promised higher rate or* [handwritten insertion]

supervisors chose who they wanted to come back, mainly white men. Pauline was badly handicapped and I knew she would never be promoted, because she had a complaint and especially since she was blacklisted. I did not know her personally and this was not the kind of thing someone would bring up to a personnel specialist, who serviced our area. I just felt sorry for her.

Although I did find myself another position, my supervisor refused to let me go. It seemed to me that when you had made a complaint the employment and shop supervisors worked together. You could not

Page 4 of 5                                                          Initials _____

$Ex$ # 7

even get reassigned to better your career. I was told I was denied because my department head, Leslie Platt wanted me denied. I received no additional training after my complaint or anything else which would have been career enhancing. They would give me these things if I settled my EEO complaint their way. I regret I did not make a complaint myself on the blacklist at the time and would like to be a part of a class action.

I Declare under the penalty of perjury that the foregoing is true and correct to the best of my understanding and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Signed at: _____,   _____
                    (County)                           (State)

_____                    3/30/99
        (Signature)                              (Date)

Page 5 of 5                                    Initials _____

ExH 7

# DECLARATION

## *I, Iman Visarraga declare that I am a former employee of Naval Aviation Depot, Alameda, as a Quality Assurance Specialist (GS 9).*

On or about 2/11/99, I was contacted by a counselor of the EEO, office "Cec Cilley," who asked me questions about the "Command History Book" publication. I became very upset with the telephone caller, because she is a Navy employee, and works in the EEO office. However, I answered her questions in the best possible manner (I suffer from a job related injury and a stress disorder due to the discrimination/reprisal I suffered, while I was employed by the Navy) that my health would allow.

I explained that the command history booklet was distributed to management with a routing slip attached, so that they could sign off after reading, it was blue in color with a black binding. It was used for the purpose of listing individuals who were labeled as troublemakers and had filed EEO complaints. it showed the names, status of the complaint, as it reached the Federal Courts. The magnitude of this publication had a negative impact and a devastating affect on the complainant, and showed disparate treatment in that we were subjected to profiling before and after our lawsuits were made public. Those of us who had been labeled trouble-makers and did have write ups were constantly signaled out with letters of reprimand, letters of caution, intimidated, threatened and verbally warned by management officials to drop our complaints. The chain of command turned a blind eye as to what was taking place within the facility. We were treated differently than those whose names did not appear on that list, such as denied promotions, constantly humiliated, moved from one hostile work environment to the next. The reprisal/retaliation we faced came with being linked to the "Hit List." The practices used by the activity and management was their method of punishing those employees who chose to speak out.

**PAGES 1 OF 4**

INITIALS

$Ex$ $H$ $S$

## D E C L A R A T I O N

Thus, we became over whelmed and this led to far more illnesses for those of us who were involved.

What was penetrating, and mind boggling, was seeing my name with a list of numbers next to my name. There were other names of other individuals whose names were from different departments on the base who I knew, and who also had complaints and numbers by their names. Some were printed in the publication, others were hand-written in. One, being, that of |**Pauline Horvath**|, which had been penciled on to the list. How I remember this name, is that, I was having a lot of problems with my payroll and Ms. Horvath was the personnel specialist, whose name I was given by management to take care of the problem. I recall thinking to myself, what purpose would there be to generate this type of list and its distribution through out the facility and/or its purpose. On the surface, this hit list was their way of showing their efficiency, and how the command was functioning. Better worded, it was their way of grading the Command and evaluating their strong and weak points e.g., how many EEO Complaints were filed, how many were pending, how many appeals, decisions, and how many had been settled. All of this hurt the careers of those who had Workers' Compensation and/or EEO Complaints. The careers of those who had EEO, or had Worker's Compensation claims suffered by being denied promotions and other benefits. When management learned an employee had made any type of complaint or claim, they did not want to reward them. They considered them to be trouble-makers and not worthy of promotions.

However, at this time I was far too ill and in Federal Court (Pro Per), to make any sense of what all of this meant to me. In my, after my on the job injury, my personal privacy rights were violated without my prior consent. I was ostracized by the facility, my peers and my department, and told that management did not even want my name mentioned in their presence. I was constantly passed over for promotions, although, I was better qualified than some of the people who were hired over me.

When I was in Federal Court, for my first promotion case, it was dismissed for a motion I have yet to see. ..I was far too ill, and on medication to really be aware of what was happening to me.

**PAGES 2 OF 4**                                            **INITIALS**

$Ex$ $H$ $8$

## D E C L A R A T I O N

I was promised handicap parking by management, but was never assigned one. However, they insisted that I work in one building and drive across the base. There I was to check in with my Supervisor and pick up my daily assignments. All of this was very up-setting to me, because there were times when I could not find a parking place and/or I would have to walk a long way to pick up my work for that day. I can recall once when I could not find a parking spot. I had to drive all the way back to the building where my desk was located, calling my supervisor, informing him that there was no where for me to park…only to find another supervisor scolding me for not being busy, clearly this was harassment. I was also assigned to another area where there was no bathroom, and told that I could not leave the area from the time I arrived until the time I left. This was very difficult for me when I would have to use the bathroom. When management found me out of the assigned area, they would intimidate me with threats of disciplinary action. I was yelled at and belittled by management in front of my peers, embarrassed by having my privacy rights violated.

Finally, I was medically terminated…reason given was that they could not accommodate my disabilities, and that my [ALAMEDA, NAVAL AIR STATION, JOB SEARCHS] proved fruitless. I now know that by my name being placed on the hit list prevented me from continuing in my career at [NADEP, ALAMEDA], and caused my termination. The hostile work environment, and the tense atmosphere for those who dared speak up for our rights, should have never been tolerated by this Command. Moreover, under The Constitution of the United States, our rights have been denied by this type of behavior and what we were forced to endure, by the same management officials. In one of my cases, I was denied my basic rights by the NADEP EEO Office, by disallowing me to file my EEO complaint. They would not give me the proper forms to file the complaint. Therefore, I had to sit approximately two hours or more, until they reluctantly gave me the proper forms. The only reason I was given the forms was because, it was closing time and they wanted to leave. The Command refused to admit that they hired improperly trained managers or individuals that hid behind discrimination practices. It was the common practices to use retaliatory

**PAGES 3 OF 4**                                                         **INITIALS**

$Ex \; H \; 8$

## D E C L A R T I O N

measures against those who made any type of complaints or claims against management.

I know I have been wronged, therefore, I would like to be part of this **[CLASS ACTION, LAW SUIT]**.

I am requesting that this **DECLARATION replace** my previous **DECLARATION** signed on **June 11, 1999**, because of my grammar errors.

**I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FORGOING IS TRUE AND CORRECT TO THE BEST OF MY UNDERSTANDING AND BELIFE. I UNDERSTAND THAT THE INFORMATION I HAVE GIVEN IS NOT TO BE CONSIDERED CONFIDENTIAL AND THAT IT MAY BE SHOWN TO THE ONTERESTED PARTIES.**

SIGNED AT: <u>ALAMEDA, COUNTY</u>                    <u>STATE OF CALIFORNIA</u>

SIGNATURE:                                         DATE: <u>JUNE 17, 1999</u>

**PAGES 4 OF 4**

Ex H 8

My name is Carol Fairweather. I affirm under penalty of perjury that what I write is true, to the best of my recollection.

I was an electronics apprentice at the Naval Air Rework Facility (later renamed Naval Aviation Depot) Alameda from 1974 until my early graduation in 1977. Upon graduation I became a WG-11 Journeyman Electronics Mechanic. I was chosen as Outstanding Apprentice for all the trades in 1978 and given a gold watch by the Commanding Officer. After a couple of years, I was promoted to WG-12, the highest mechanic position. A few years later, I was downgraded to a WG-11 (with all of the other WG-12s), while keeping my pay rate.

In 1983 and '84, I participated in a class action suit against the Navy by the women in Avionics. I was asked several times by management if I wanted to opt out of the class, but I did not. Although I, personally, had beer treated well by management up until that time, I had seen in shops I rotated through, in the course of the apprenticeship program, that frequently women doing the same work as the men were many grades lower. (Most men were usually WG-11 or 12 mechanics, while women were usually WG-8 workers.) The class action suit sought promotional opportunities for avionics women workers. I sought nothing for myself, since I was at the highest mechanic rate.

In 1984, for the class action suit, I appeared in court before Judge Marilyn Hall Patel and testified about the difference in rates between men and women doing the same work. I also testified that I had never had to use my knowledge of algebra (I had been a math teacher at the Postal Street Academy, a school for high school dropouts, for two years) to repair electronic equipment, other than plugging numbers into existing formulas. Our testing and repair procedures were detailed in our Navy guidelines and manuals. (The Navy had made a claim during that case that the women couldn't be mechanics because they did not commonly use algebra.) I had received outstanding ratings for my own work and was considered by then an expert on VAST, a high-profile automatic test system for S-3 aircraft electronics.

Within a week of my testimony in the class action, a selection was made for the Electronics Mechanic Instructor position at NADEP, for which I had applied and been rated highly qualified. A male with less experience was selected (David Cross). He had a reputation as a good mechanic and, although I was disappointed, I accepted the decision. Not long afterwards, a second selection was made from the same list. This time a man was selected (Pete Birchfield) who I personally knew did not understand electronic theory well enough to be a good instructor. I was appalled that the selecting officials had deemed him more qualified to teach than I. Moreover, I was the only one of the three of us who had a bachelor's degree and previous real teaching experience. The Navy was also under a court order to try to find qualified females for the instructor position, a position in which they had never had a female. I filed an EEO complaint on my non-selection, based on discrimination because of my sex and retaliation because of my participation in the class action suit.

Years later, after I had left Avionics, I won on my complaint and was awarded the position retroactively. The Navy was reprimanded for their cover-up and ordered to do a NADEP-wide posting about the decision and their future non-discrimination policy.

Before my testimony in the class action suit in 1984, I had been encouraged by my Avionics manager, Terry Jones, to apply for a supervisor's position when one came open because a

Ex H 9

woman was due to be chosen. After my class action testimony and my own EEO suit, he made a comment to me to the respect that I didn't have any chance at getting selected now. I still put in for avionics supervisor and did not get selected, although I had been rated highly qualified. A woman with less experience who had opted out of the class action suit did (Cheryl Terbeck). I did not file a complaint on that non-selection because I knew I would have difficulty proving that I had suffered discrimination because of my involvement in the class action suit and my own EEO case.

As union steward, I accompanied active class member Suzanne Tucker to speak with Superintendent Frank Nieto to discuss her low rating for the same position. He increased her points, although no change was made in the selection. (During the interview, as an aside, Mr. Nieto asked me why I hadn't filed a complaint since I had "aced" the application.)

In 1985, I put in for a position outside of the Avionics Division, accepting that I would not advance there. I briefly became an Electronics Technician (GS-11) in the Engineering Division, before accepting a lateral transfer in 1986 to a position as Senior Employee Development Specialist in the Employee Development Branch of the Civilian Personnel Department, hoping for an opportunity to teach there.

I was already receiving higher pay as a GS-11and had teaching duties in Employee Development when I received word that I had won my EEO complaint for the Electronic Mechanic Instructor position. Although, under the decision, my paperwork was modified at that time to show that I had been selected for the Electronics Instructor position back to David Cross' selection date, I never did actually work in that position.

I put in at least twice for the supervisor position in Staff Development, but was never selected, although I always rated highly qualified. I did not file any complaints.

I remained in that position until the base officially closed in 1996. I was asked to stay on at the base as a contractor with LSI Services for another year as assistant director of the Alameda Career Transition Center working with former employees, helping them to use computers to research jobs and write resumes; I did.

While in the Employee Development Department, during my last several years, I wrote the portion of the annual Command History describing training and development accomplishments for the past year. I never saw a complete copy of the Command History at the time and was unaware that my name had been listed in it with respect to my EEO complaint until former base employee Pauline Horvath showed me a copy of a list at a base reunion picnic after the base had closed. I had spoken with Pauline only a few times before that, when she was a Civilian Personnel Department employee seeking training.

I may be reached at 920 Walnut Street, Alameda, CA 94501. My telephone number is (510) 521-7788.

Carol Fairweather                6/19/04

Carol Fairweather

$E_x$ H9

## PROOF OF SERVICE

I, THE UNDERSIGNED, HEREBY CERTIFY THAT I AM A CITIZEN OF THE UNITED STATES, OVER THE AGE OF EIGHTEEN YEARS, AND NOT A PARTY TO THE WITHIN ACTION.   MY ADDRESS IS: _3544 Custre SF. #3. Oakland_ _California 94601_

I SERVED A COPY OF THE ENCLOSED DOCUMENTS AND ANY ATTACHMENTS DESCRIBED AS:

AMMENDED COMPLAINT No. C 07-4952 JSW, WITH EXHIBITS

EITHER IN PERSON OR BY CERTIFIED MAIL, ON THE PERSONS LISTED BELOW.

| NAME | ADDRESS | DATE SERVED |
|---|---|---|
| MICHEL THOMAS PYLE U S  ATTORNEY'S OFICE | U.S. DISTRICT COURT 450 GOLDEN GATE AVENUE BOX 36055 SAN FRANCISCO, CA  94102 | 5-2-08 |
| CLERK OF THE COURT U.S. DISTRICT COURT NORTHERN DISTRICT OF | U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA 450 GOLDEN GATE AVENUE SAN FRANCISCO, CA 94102 | 5-2-08 |

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT AND THAT THIS DECLARATION WAS EXECUTED ON _5-2-08_ AT OAKLAND, CALIFORNIA

_____
SIGNATURE